IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STARLING E. UNDERWOOD          :      CIVIL ACTION
                               :
          v.                   :
                               :
LA SALLE UNIVERSITY            :      NO. 07-1441

MEMORANDUM

Dalzell, J.                                    December 3, 2007

        Plaintiff Starling Underwood, a former student in La
Salle University's undergraduate nursing program, has sued La
Salle under 42 U.S.C. § 1981 for allegedly dismissing him from
its nursing program on the basis of his race.  La Salle moved for
summary judgment, and in his response Underwood seeks to expand
his claims to include race discrimination under Title VI of the
Civil Rights Act of 1964 as well as gender and disability
discrimination claims under Title IX of the Civil Rights Act, the
Rehabilitation Act, and Title II of the Americans with
Disabilities Act ("ADA").

        We here resolve both La Salle's motion for summary
judgment and Underwood's twelfth-hour motion to amend his
complaint, and do so in favor of La Salle.

## I.  Factual Background[1]

Underwood has worked as a security guard at Children's Hospital of Philadelphia since 1992.  Def.'s Mem., Ex. A. (Underwood Dep.) at 13-14.  While working at Children's Hospital, Underwood took classes at the Community College of Philadelphia. Id.  In 2002, he applied to La Salle's School of Nursing, and was accepted into its program.  Id. at 30-31.  In August of 2003, he enrolled as a junior in La Salle's ACHIEVE program[2].  Id.  From the 2003 fall semester through the 2004 fall semester, Underwood successfully passed nine classes in the nursing program.  Id., Ex. 1.  In the 2005 spring semester, Underwood took two classes, Nursing Research and Care of Children and Adolescents, in which

---

[1]Underwood provides no testimonial evidence of his own because he did not depose any witnesses.  Underwood first contacted opposing counsel to schedule depositions on September 11, 2007 - one day before the close of discovery.  In his letter, which was also carbon copied to the Clerk of Court, he sought consent from opposing counsel for a sixty-day extension of discovery.  Pl.'s Mem. Ex. C.  Opposing counsel objected to Underwood's request in a letter dated the same day.  Id. Ex. E.

Even if opposing counsel had not objected, parties cannot extend discovery through consent, and we would not have granted such an extension.  We gave Underwood ample time to conduct discovery, but he failed to use that time and sought to extend it at too late a date.

[2]The ACHIEVE program is a part-time, evening program for students who are employed full-time, but are seeking a Bachelors of Science degree in Nursing.  Def. Mem., Ex. B, Ex. 2 p. 210.

he received grades of "F" and "D", respectively.  Id., Ex. 1.

To maintain one's standing at La Salle's School of Nursing, a student must earn a grade of "C" or better in every course taken.  Id. at 7-8, Ex. 2 (Student Handbook) at 33.  A student earns a "C" if she or he receives an overall score of at least 75% in a course.  Student Handbook at 25.  If a student earns less than a "C" in two courses in the same or sequential semesters, then it is La Salle's policy to dismiss that student from the nursing program.  Underwood Dep. at 7-8; Student Handbook at 33.

If a student feels that she is doing poorly in a class, she can avoid a bad grade by withdrawing from the course.  To withdraw from a course, a student must file a written request with the Dean's Office.  Id. at 157-58, Ex. 16 (Undergraduate Catalog) at 20; Def.'s Mem., Ex. B (Hoerst Decl.), Ex. 2 at 145. In any given semester, a student must file for withdrawal before the date designated in the academic calendar as the "withdrawal deadline."  Undergraduate Catalog at 20; Hoerst Decl. Ex. 2 at 145.  A student cannot effect a withdrawal by notifying the instructor or by not attending class.  Id; Hoerst Decl. Ex. 2 at 145.  In the 2005 spring semester the deadline for withdrawing from a course was April 5, 2005.  Underwood Dep. Ex. 6.

3

A student can also avoid a potential bad grade if the instructor gives the student an incomplete for the course. According to La Salle policy, an incomplete is warranted only when "a student who has otherwise maintained throughout the semester a passing grade in the course, but [failed] to take the semester examination or complete all assigned course requirements for reasons beyond his/her control."  Student Handbook at 25; Undergraduate Catalog at 20.

In a May 24, 2005 letter, Diane M. Weiland, Director of the Undergraduate Nursing Program, notified Underwood that pursuant to its policy La Salle was dismissing him from its nursing program because he had failed two classes in the same semester.  Underwood Dep. Ex. 19.

## A.    Care for Children and Adolescents

In the 2005 spring semester, Dr. Mary Anne Peters taught Nursing Care of Children and Adolescents, also known as Pediatrics, a required senior-level class in La Salle's undergraduate nursing program.  Id. at 38, Ex. 2 at 1.  The class syllabus explained that the course had both clinical and in-class parts.  Id. Ex. 2 at 1.  The clinical part of the course was pass/fail.  Id. Ex. 2 at 3.  A student's final grade for the in-

class part of the course was based on her score on three factors: (1) the first take[3] of the medication math test, which was worth 10% of the overall grade, (2) three unit exams each worth 20%, and (3) a final comprehensive exam worth 30%.  Id.  The class syllabus also stated that "[a]pproved calculators will be provided by the professor", id. at Ex. 2 at 4, and that "[a]ny student requesting special accommodations for test taking must follow the University policy and procedure with regard to the American [sic] with Disabilities Act guidelines."  Id. at 5.

Underwood averaged a "D" in Pediatrics.  He received a 50% on his first take of the medication math test, an 80%, 59%, and 81% on the three respective unit exams, and a 76% on the final.  Id. at 52-52, 67-68, 82-86, Ex. 3, 7-9, 11.  Thus, he averaged just below 72% overall, earning him a "D" in the course. Id. 87-89, Ex. 12.

During at least one exam, Underwood was not permitted to use his own calculator.  Id. at 97-99.  Dr. Peters announced

---

[3]Students were required to take this exam over until they received a grade of at least 80%.  Underwood Dep. Ex. 2 at 5.  A score of 80% on this exam was a prerequisite to administering medication in the clinical portion of the test, and if a student failed to receive an 80% by midterm, she or he would be in clinical jeopardy.  Id.  Nonetheless, only the first take of the exam counted towards the student's final grade.  Id.

at the beginning of the exam that students were only allowed to use a calculator she issued. Id. at 97-98.  Prior to that day in class, Underwood had not requested to use his own calculator during this exam.  Id. at 97, 98-99, 99-100.  Underwood saw that prior to the start of this exam Dr. Peters permitted an African-American female student to use the calculator that she had brought rather than an issued one.  Id. at 98, 100.  Underwood then asked Dr. Peters if he could use the calculator he had brought to class.  Id. at 93-94, 98-100. Underwood testified that Dr. Peters told him that he could not because he could use his calculator to cheat on the exam.  Id. at 93-94.  Underwood testified that he had difficulty seeing the display panel and pressing the buttons on the issued calculator, and did not feel comfortable with the calculator or have "confidence" in it.  Id. at 96, 100-01.

### B.   **Nursing Research**

In the 2005 spring semester, Dr. Barbara Hoerst taught Nursing Research, a required senior-level course.  The focus of the class was developing, designing, and drafting research proposals.  Id. Ex. 13 at 1.  The class syllabus explained that the grade for the course would be determined by four factors: (1)

two multiple-choice exams, each worth 20% of the overall grade,
(2) a formal paper, consisting of three drafts and a final paper,
each worth 10%, (3) a critique of a research article worth 15%,
and (4) class participation worth 5%.  Id. Ex. 13 at 2-3.  The
syllabus also contained a schedule for every exam and assignment
during the entire course, as well as instructions on when each
draft of the formal paper was due, what it should contain, the
criteria it would be judged by, and a suggested layout.  Id. Ex.
13 at 4-7.

      Underwood received an "F" in Nursing Research.  He got
82% and 50% on the two multiple-choice exams, 85% for the
research article critique, 50% for class participation, 70% on
the first draft of the formal paper, and 0% on all subsequent
versions.[4]  Hoerst Decl. ¶¶ 3-8. Underwood did not submit a final
version of the formal paper, and therefore received 0% for that

---

[4]Underwood received 70% for the first draft of the formal
paper because Dr. Hoerst found that the paper "lacked a clear
form of question."  Hoerst Decl. ¶ 6.  He received 0% for the
second draft because Dr. Hoerst found that the paper "was not
focused on one clear issue and was not written according to the
course guidelines."  Id. ¶ 7.  Dr. Hoerst gave Underwood two
extensions to submit the third draft of the paper, but it also
received 0%.  Id. ¶ 8.  Dr. Hoerst determined that Underwood had
not incorporated her comments on the previous versions into the
paper, and the paper was much the same as the version he had
turned in previously.  Id.

as well.  Hoerst Decl. ¶ 10. Underwood's overall average was 49%, earning him an "F" in the course.  Hoerst Decl. ¶ 11.

At some point in early March, Underwood contacted various members of La Salle's administration in order to explore his options because he understood that things were not going well in his Nursing Research course.  Underwood Dep. at 121-31. Underwood testified that he was directed to an assistant dean of the nursing program, Mary Dior, to whom Underwood explained his problems.  Id. at 129-31.  At that time, Ms. Dior suggested that he talk with Dr. Hoerst to see if she would let him withdraw from the course.  Id. at 131.

But Underwood did not meet with Dr. Hoerst until April 26, 2005 the final day of the course, and only then because she had sent him an email on April 22, 2005 requesting that he make an appointment to discuss his paper.  Id. at 132-33, Ex. 15.  It was during this meeting that Underwood first broached the subject of withdrawing from Nursing Research.  Id. at 133; Hoerst Decl. ¶ 9.  Dr. Hoerst stated that he could not do so, id. at 138; Hoerst Decl. ¶ 9, as the deadline for withdrawal was April 5, 2005.  Id. Ex. 6.  Underwood also requested that Dr. Hoerst extend the deadline for his final paper and permit him to take the final exam at some later date.  Course Decl. ¶ 9.  Dr. Hoerst had

8

already granted Underwood two extensions on his third draft of his paper, and declined to give him any more time to complete the course because of the "untimeliness [of his requests], his lack of class participation, and his poor attendance during the semester."  Id. ¶¶ 8-9.

On February 15, 2005, Linda Kamnik, a Caucasian female nursing student enrolled in the same program and Nursing Research course as Underwood, withdrew from Nursing Research by filling out a Notice of Course Withdrawal form and handing it in to the Dean's office.  Hoerst Decl. ¶ 12, Ex. 1.  Kamnik's transcript reflects the withdrawal with a "W".  Id.  In a later semester, she once again enrolled in Nursing Research and passed the course.  Id.

### C.   **Aftermath**

After receiving the "D" from Dr. Peters, Underwood spoke to her in an attempt to change his grade, but she declined his request.  Underwood Dep. at 173-74.  In a May 24, 2005 letter, La Salle notified Underwood that it had dismissed him from the nursing program.  Id. Ex. 19.

Two days later, Underwood appealed his Pediatrics grade to the Dean and Director of the Nursing Program, but they, too,

denied his appeal.  Id. Ex. 20.  At this point, Underwood contacted Pennsylvania State Representative Ronald G. Waters and wrote to Mr. John J. Lynch, former Chairman of La Salle's Board of Trustees, in an attempt to have La Salle reinstate him in the nursing program.  Id. at 151-55, 172-78, Ex. 22.  In response to the letter to Mr. Lynch, La Salle's Provost's Office investigated Underwood's claims, but this resulted in no further action.  Id. at 178-86.  Underwood did not attempt to appeal his grade in Nursing Research because he believed he "had no grounds."  Id. at 172.

In his deposition, Underwood testified that he did not believe that race played a role in the grades Dr. Peters or Dr. Hoerst gave him on his exams and papers in their respective courses.  Id. at 100-03, 138-40, 172.

## II.  Analysis[5]

---

[5]Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Liberty Lobby, 477 U.S. at 255.
     The moving party bears the initial burden of proving that

Underwood claims La Salle discriminated against him on the basis of race, gender, and disability, thereby violating his rights under Title VI and IX of the Civil Rights Act, the Rehabilitation Act, Title II of the ADA, and 42 U.S.C. § 1981. Underwood's original complaint alleges only race discrimination under § 1981.  Compl.  Underwood first asserted race discrimination under Title VI, gender discrimination under Title IX, and disability discrimination under the Rehabilitation Act and the ADA, in his response to La Salle's motion for summary judgment.  Pl.'s Mem. at 1.

---

there is no genuine issue of material fact in dispute. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" <u>Matsushita</u>, 475 U.S.  at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  <u>Trap Rock Indus., Inc. v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir.1982).  It is not enough to discredit the moving party's evidence, the non-moving party is required to "present <u>affirmative</u> evidence in order to defeat a properly supported motion for summary judgment." <u>Liberty Lobby</u>, 477 U.S. at 257 (emphasis in original).  A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50.  Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

We shall first consider whether Underwood can properly assert his newly-minted gender and disability claims, and then we will turn to the remaining claims and analyze them under the standard announced in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981).

### A.   **The Gender and Disability Claims**

We construe Underwood's assertion of gender and discrimination claims as a motion to amend his complaint.  Leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Leave to amend, however, is properly denied on the grounds of "undue delay, bad faith, dilatory motive, prejudice, and futility."  <u>Shane v. Fauver</u>, 213 F.3d 113, 115 (3d Cir. 2000).  La Salle argues that we should deny Underwood's motion to amend his complaint to include the gender and disability claims because they are untimely and futile, and amending the complaint now would be prejudicial.

Underwood's gender and disability claims are time-barred.  As neither Title IX nor the Rehabilitation Act nor Title II of the ADA specify a statute of limitations, we apply the most analogous state statute of limitations to the claim.  <u>Goodman v.</u>

Lukens Steel Co., 482 U.S. 656, 660-64 (1985).  Other courts
faced with this question have applied Pennsylvania's two-year
statute of limitations for personal injury actions, and we agree
with them.  Brougher v. Univ. of Pittsburgh, 882 F.2d 74, 78 (3d
Cir. 1989) (Title IX); Estrada v. Trager, 2002 WL 31053819, *4
(E.D. Pa. Sept. 10, 2002) (Rehabilitation Act and ADA).
Underwood's causes of action accrued when he was dismissed from
La Salle on May 24, 2005, and thus the statute of limitations had
run by the time he moved to add these claims on October 17, 2007.

A plaintiff can still amend his complaint with an
otherwise time-barred claim if that claim relates back to the
original pleading, i.e., "the claim...arose out of the conduct,
transaction, or occurrence set forth or attempted to be set forth
in the original pleading."  Fed. R. Civ. P. 15(c)(2).  To
determine whether the new claim properly relates back, we must
look "to whether the opposing party has had fair notice of the
general fact situation and legal theory upon which the amending
party proceeds."  Bensel v. Allied Pilots Ass'n, 387 F.3d 298,
310 (3d Cir. 2004).

The disability claim does not relate back.  Underwood
asserts he is disabled because he suffers from bad eyesight and

13

uses Ebonics[6].  Pl.'s Sur-reply at 5-6.  Nothing in the original complaint or anything said during Underwood's deposition suggests that he intended to bring suit on the basis of either of these purported disabilities.[7]  Even construing all of Underwood's claims and statements as liberally as possible for a pro se plaintiff, he gave La Salle no notice that he would seek to bring a disability claim.  Thus, the disability claim cannot relate back.

Moreover, Underwood's disability claim is futile.  A claim is futile if "the complaint, as amended, would fail to state a claim upon which relief could be granted."  Shane, 213 F.3d at 115.  To have a "disability" within the meaning of the ADA or Rehabilitation Act, one must: (a) have a physical or mental impairment that substantially limits one or more of her

---

[6]This is African-American English, especially when considered as a distinct language or dialect with linguistic features related to or derived from those of certain West African languages, rather than as a non-standard variety of English. http://dictionary.oed.com/cgi/entry/00314282?single=1&query_type= word&queryword=ebonics&first=1&max_to_show=10

[7]During the deposition, Underwood brought up disability as the basis for a claim only once, and then only to state that he was aware of such a claim but opted not to bring it.  Underwood Dep. at 180.

major life activities;[8] (b) have a record of such an impairment; or (c) be regarded as having such an impairment.  42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B).  So understood, neither of Underwood's bases for disability, <u>i.e.</u>, poor eyesight or use of Ebonics, amounts to a disability.

Underwood's impairments do not substantially limit his major life activities.  Underwood asserts that he suffers from impaired vision due to his diabetes, but this impairment has not affected his ability to work as a security guard or be a student at La Salle.  Underwood Dep. at 13-14, 30-31, Ex. 1.  The only negative effect of his reduced vision during his entire time in La Salle's nursing program was that he had difficulty seeing the display screen of the calculator he was issued during one exam. <u>Id.</u> at 100-01.  As to the other basis for Underwood's disability

---

[8]To assess whether one is "substantially limited in a major life activity," we consider "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).  Notably, "[t]o rise to the level of a disability, an impairment must <u>significantly restrict</u> an individual's major life activities.  Impairments that result in only mild limitations are not disabilities." <u>Kelly v. Drexel University</u>, 94 F.3d 102, 107 (3d Cir. 1996) (quoting 2 <u>EEOC Compliance Manual</u> § 902, at 902-19) (emphasis added).  In other words, the ADA affords protected status "only [for] extremely limiting disabilities." <u>Marinelli v. City of Erie, Penn.</u>, 216 F.3d 354, 362 (3d Cir. 2000).

claim -- his use of Ebonics -- at most makes him as disabled as any one in the United States for whom English is a second language, none of whom would be considered "disabled" under the Rehabilitation Act or the ADA.

A plaintiff could still sustain a disability claim if he were "regarded as"[9] disabled, but Underwood has not shown that La Salle regarded him as disabled.  Nothing he said in his deposition suggests that La Salle treated him as if he were disabled because of his poor eyesight or use of Ebonics.  In fact, Underwood's underlying complaint is that La Salle underlined to regard him as disabled and properly accommodate him.  As Underwood's purported impairments do not amount to a disability, neither the Rehabilitation Act nor the ADA mandate any accommodation.

---

[9]One is "regarded as" disabled if she or he:
(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
(3) Has none of the impairments defined in paragraph (h) (1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.
29 C.F.R. § 1630.2(l).

The gender claim is a different story.  Underwood complained that La Salle did not permit him, a man, to be excused from certain classes but did permit Kamnik, a woman, to be excused.  Compl. ¶¶ 5-7.  Underwood also testified that he believes he may have been subject to gender discrimination in both Dr. Peters's and Dr. Hoerst's classes.  Underwood Dep. at 101, 139.  As such, La Salle was on notice about Underwood's gender discrimination claim, and thus it does relate back to his original complaint.

We also cannot say that Underwood's claim is futile. He alleged that Kamnik was permitted to withdraw from Nursing Research while he was not.  Compl. ¶¶ 5-7.  Also, Underwood testified that a woman in Dr. Peters's class was permitted to use her own calculator during an exam but he was not.  Underwood Dep. at 98, 100.  Such allegations and testimony provide sufficient factual basis to state a claim for gender discrimination.

But to grant Underwood's motion to amend his complaint at this late stage of the litigation would palpably prejudice La Salle.  Discovery has closed and La Salle has filed its motion for summary judgment.  Although La Salle was on notice about the gender claim, Underwood testified that he believed he had a potential gender discrimination claim but chose only to move

17

forward on the race discrimination claim.  Id. at 180.  Moreover,
to permit Underwood to alter the very claims for which he seeks
redress would make all of La Salle's efforts for naught and
oblige us to go back to the beginning.  Underwood had ample time
to bring, change, and develop his claims, but failed to do so.
He now fondly hopes that because of his pro se status he will be
permitted to dispense with the Federal Rules of Civil Procedure
and their concomitant policy concerns.  We will deny Underwood's
motion to amend his complaint as it relates to the gender and
disability claims.

### B.   **The Race Discrimination Claim**

Underwood's remaining claims are race discrimination
under Title VI and § 1981, and we analyze both claims in the same
way.  See Pryor v. Nat'l Collegiate Athletics Ass'n, 288 F.3d
548, 562 (3d Cir. 2002).  When a student-plaintiff does not
assert or cannot present direct evidence of discrimination, then
his claims are subject to the familiar McDonnell-Douglas burden-
shifting analysis as adapted to the educational context.  Manning
v. Temple Univ., 2004 WL 3019230 at *4 (E.D. Pa. Dec. 30, 2004)
(citing Bell v. Ohio State Univ., 351 F.3d 240, 252-53 (6th Cir.
2003)).  Under this approach, the plaintiff must first prove a

prima facie case of discrimination.  McDonnell-Douglas, 411 U.S.
at 802; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506
(1993).  If the plaintiff succeeds, then the burden shifts to the
defendant to "articulate some legitimate, non-discriminatory
reason for the [student's dismissal]" McDonnell-Douglas at 802.
Then the burden shifts back to the plaintiff to show the reason
proffered is a pretext for discrimination.  Id. at 804.

## 1.   **The Prima Facie Case**

To establish the prima facie case, Underwood must show
that (1) he is a member of a protected class; (2) he suffered an
adverse action at the hands of the defendant in the pursuit of
his education; (3) he was qualified to continue in the pursuit of
his education; and (4) he was treated differently from similarly
situated students who are not members of the protected class.
Manning, 2004 WL 3019230 at *4 (quoting Bell, 351 F.3d at 252-
53).  La Salle only disputes items (3) and (4).

In support of his claims, Underwood proffers three
contentions to show that he has presented the prima facie case.
First, he notes that he was never given a written or oral warning
that he should seek an incomplete or withdrawal from either
Pediatrics or Nursing Research  Second, he contends he did not

receive notice as required under La Salle policy that he was in clinical jeopardy.  Lastly, he argues that when he asked to withdraw from Nursing Research Dr. Hoerst did not allow him to, but Linda Kamnik, who was similarly situated, was permitted to withdraw.

Based on these facts, Underwood cannot show that he was qualified to continue this program.  Underwood admitted that his race did not affect the scores Dr. Peters and Dr. Hoerst gave him on the exams he took and the papers assigned to him.  Underwood Dep. at 100-03, 138-40, 172.  Since the final grades in these classes resulted from weighted averages of the relevant exams and papers, race could not have been a factor in calculating the final grades Underwood received.  Id. Ex 2, 13.  As such, Dr. Peters and Dr. Hoerst legitimately gave Underwood a "D" and "F" respectively in the course each taught, and according to La Salle policy Underwood was properly dismissed.

Underwood does not contest that these grades were legitimate, but he argues that La Salle discriminated against him by not counselling him to withdraw from either of these courses. La Salle responds that it has no policy that requires or even suggests that La Salle faculty should counsel students to withdraw from classes if they are in danger of failing.

20

Underwood, in response, points to the La Salle clinical jeopardy policy as one requiring that La Salle faculty notify students if they are failing, but this policy on its face applies only to the clinical section and not the in-class section of a particular course.  Def. Mem. Ex. B at 21-22.  Nowhere has Underwood alleged or suggested that he was failing the clinical portion of any course or that La Salle failed to inform him of that fact.  As such, the clinical jeopardy policy does not apply to Underwood's situation.

Furthermore, Underwood testified that in March of 2005 Mary Dior, Assistant Dean at La Salle, told him to contact Dr. Hoerst to see if she would let him withdraw from Nursing Research, undercutting his assertion that no one counselled him on withdrawing.  Underwood Dep. at 131.  It was Underwood who failed to meet or discuss withdrawal with Dr. Hoerst until April 26, 2005, which was the last day of class and well after the deadline has passed for withdrawal.  Id. at 133, 138, Ex. 6; Hoerst Decl. ¶ 9.  We cannot fault La Salle for Underwood's failure to act.

Underwood also argues that even if La Salle did not have to counsel him to withdraw, Dr. Hoerst could have given him an incomplete in Nursing Research.  But La Salle's incomplete

21

policy only applies to students who have been unable to complete the work assigned "for reasons beyond his/her control."  Student Handbook at 25; Undergraduate Catalog at 20.  Underwood does not point to any circumstances beyond his control that caused him to fail to revise and hand in his Nursing Research paper or prevented him from taking the final exam.  Therefore, La Salle's incomplete policy does not apply to him.

Even if Underwood could establish that he was qualified to continue in the pursuit of his education, he cannot show that he was treated differently than similarly situated students not in the same protected class.  Underwood argues that Kamnik, a Caucasian female student in La Salle's undergraduate nursing program, was permitted to withdraw from Nursing Research while he was not.  However, Kamnik is not a similarly situated student. Kamnik filed her withdrawal with the Dean's Office on February 15, 2005, well before the April 5, 2005 deadline.   Underwood Dep. Ex. 6; Hoerst Decl. ¶ 12, Ex. 1.  Underwood, on the other hand, never filed for withdrawal, and did not even broach the subject with Dr. Hoerst until three weeks after the deadline. Hoerst Decl. ¶ 9.  Since Kamnik's withdrawal was timely, she is not similarly situated to Underwood.

2.  **Pretext**

Even if Underwood did establish a prima facie case, his claim would still fail because there is nothing in the record that suggests that La Salle's proffered reason for his dismissal is a pretext.

Assuming Underwood was able to make out a prima facie case of discrimination, La Salle must offer a legitimate, non-discriminatory reason for its decision to dismiss Underwood. McDonnell-Douglas, 411 U.S. at 802; Hicks, 509 U.S. as 506.  La Salle officially dismissed Underwood from the nursing program because he had failed two classes in the same semester, and according to La Salle policy this meant he could not advance and had to be dismissed.  Underwood Dep. Ex. 19.

Once La Salle articulated a legitimate reason, the burden returned to Underwood.  McDonnell-Douglas, 411 U.S. at 804.  Underwood must now point to evidence -- circumstantial or direct -- from which a reasonable factfinder could either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Under the Fuentes test, the evidence plaintiff proffers must meet

a heightened "level of specificity" to survive summary judgment.
Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998).  If
the plaintiff satisfies either prong of the Fuentes test, he
survives summary judgment.  Keller v. Orix Credit Alliance, Inc.,
130 F.3d 1101, 1108 (3d Cir. 1997)

Underwood can satisfy neither prong, and he does not
try.  He presents no evidence suggesting either that the
proffered reason is unworthy of credence or that race was a
motivating factor for the decision to drop him from the program.
Indeed, La Salle has attached the tests Underwood took in
Pediatrics and Nursing Research as well as the final paper for
the latter course, and these establish the basis for the grades
Underwood received.  Underwood Dep. Ex. 3-6, 8-11, 14.
Furthermore, Underwood himself testified that he did not believe
Dr. Peters or Dr. Hoerst used race as a factor in determining the
grades on each of the exams he took or in determining the grades
on his final paper.  Id. at 100-03, 138-40.  Thus, Underwood has
failed to produce any evidence that undermines the reality that
La Salle has proffered a legitimate, nondiscriminatory reason for
his dismissal, and so we must grant summary judgment in favor of
La Salle.

BY THE COURT:

_/s/ Stewart Dalzell, J._

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STARLING E. UNDERWOOD          :      CIVIL ACTION
                               :
          v.                   :
                               :
LA SALLE UNIVERSITY            :      NO. 07-1441

<u>ORDER</u>

AND NOW, this 3rd day of December, 2007, upon consideration of defendant La Salle University's motion for summary judgment (docket number #10), plaintiff Starling E. Underwood's response, and the reply and sur-reply thereto, it is hereby ORDERED that:

       1.   La Salle University's motion for summary judgment is GRANTED; and

       2.   The Clerk of Court shall CLOSE this case statistically.


BY THE COURT:


<u>/s/ Stewart Dalzell, J.   </u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STARLING E. UNDERWOOD         :    CIVIL ACTION
                              :
          v.                  :
                              :
LA SALLE UNIVERSITY           :    NO. 07-1441

<u>JUDGMENT</u>

AND NOW, this 3rd day of December, 2007, in accordance with the accompanying Memorandum and Order, and the Court having this day granted defendant's motion for summary judgment, JUDGMENT IS ENTERED in favor of defendant La Salle University and against plaintiff Starling E. Underwood.

BY THE COURT:


/s/ Stewart Dalzell, J.